IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**EDDIE MONTOYA,**

    **Plaintiff,**

v.           No. CIV-00-1076 JC/WWD

**MERVYN'S INC., a Foreign
Corporation, a/k/a MERVYN'S,**

    **Defendant.**

## PLAINTIFF'S REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**COMES NOW** Plaintiff Eddie Montoya (Montoya), by and through his attorney Gilbert J. Vigil, and respectfully submits his requested findings of fact and conclusions of law as follows:

### REQUESTED FINDINGS OF FACT

1.  At all times material to Plaintiff Montoya's Complaint, Montoya was a resident of Santa Fe, New Mexico.

2.  At all times material to Montoya's Complaint, Defendant Mervyn's, Incorporated (Mervyn's) was a California corporation registered to conduct business in New Mexico, and it operated a store located in Santa Fe, New Mexico.

3.  Montoya was employed with Defendant Mervyn's between May 1986 and March 1, 1999.

4.  Defendant Mervyn's terminated Montoya's employment with Mervyn's effective March 1, 1999, when it abolished his Key Store Investigator position and gave Plaintiff the ultimatum of accepting a substantially less favorable position which did not carry with it supervisory responsibilities and a $1.00 per hour cut in pay.

5.  At all times material to Montoya's Complaint, Diane DeLaTorre was Montoya's direct or immediate supervisor during his employment with Defendant Mervyn's. Montoya

supervised one employee, Jennifer Jiron, prior to the substantial change in the terms and conditions of Plaintiff's employment contract, both express and implied.

6. At all times material to Montoya's Complaint, Randy Allen was Montoya's district supervisor during Montoya's employment with Defendant Mervyn's.

7. Prior to Defendant's termination of Montoya's employment effective March 1, 1999, Montoya had worked for Defendant for about twelve (12) years. Plaintiff intended to grow in his career with Mervyn's hoping to retire from Mervyn's.

8. For a period of about ten (10) years, from 1989 to 1999, Plaintiff worked for Defendant Mervyn's Asset Protection division, which although he maintained other jobs while working for Mervyn's, his intention was to be promoted and retire from Mervyn's.

9. Montoya was employed with Defendant Mervyn's in the position of "Key Store Investigator" from 1991 until his employment was terminated effective on March 1, 1999.

10. In the position of "Key Store Investigator" Montoya's duties included not only physically apprehending criminals, but also walking, using cameras and other means of surveillance, talking to store personnel and customers, developing and implementing programs and forms, scheduling, training and sharing information with other investigators, and many other duties.

11. Before July 1998 and before Defendant terminated Montoya's employment, Defendant's evaluations of Montoya's work performance included the following:

   a. Excellent - February 1997 - January 1998 Fiscal Year End Performance Review;

   b. Excellent - February 1997 to July 1997 Mid Year Performance Review; and

   c. Satisfactory + - February 1996 to December 1996 Year End Performance Review.

12. Defendant's 1997 Year End Performance Review of Montoya characterized Montoya as a leader and good communicator in Defendant's Santa Fe store.

13. That same 1997 Year End Performance Review of Montoya, subsection "Guest Service Behaviors" states that "Eddie supports the needs of the store . . . continues to provide a safe environment . . . Eddie makes good business decisions[.]" Under subsection "Teamwork Behaviors" the evaluation states "Eddie effectively contributes to teamwork . . . by maintaining partnerships . . . Eddie is a leader . . . Eddie provides quality information to the team . . . Eddie remains flexible . . . willing to make adjustments . . . on a needed basis."

14. The same 1997 Year End Performance Review of Montoya states in subsection "Performance Standards Behaviors" that "Eddie is self-motivated . . . and is knowledgeable in all functions of his job. . . . Eddie adapts well to change." The "Reduction of Shortage Behaviors" subsection describes Eddie as "<u>communicating . . . with the leadership team</u> [emphasis is mine]. . . . Eddie drives the DTM Performance in his store, exceeding his goal . . . and continues to excel. . . . Eddie <u>communicates</u> [emphasis is mine] and follows up daily with the audit team." Finally, subsection "Store Team Leader Comments," repeats that "Eddie is a leader in the store and needs to . . . continue to give positive feedback to store leadership . . . continues to 'glow' remain enthusiastic." Plaintiff relied on these positive performance statements in order to continue in his employment in hopes of being promoted and to retire from Mervyn's.

15. In Defendant Mervyn's 1996 Year End Performance Review of Montoya, Defendant also identified and recognized Plaintiff as a "leader."

3

16. Prior to Defendant Mervyn's termination of Montoya's employment, Defendant recognized Montoya's outstanding work performance by issuing to him the following awards:

    a.  Certificate of Appreciation for Excellence in Quality Shortage Control Management - December 1994;

    b.  Investigator of the Month for Montoya's "overall outstanding performance"- December 1995 and 1998; and

    c.  Investigator of the Year for Montoya's "overall outstanding performance"- 1996.

    Plaintiff relied on these positive statements relating to his performance in hopes of being promoted and to retire from Mervyn's.

17. During Montoya's employment with Defendant Mervyn's, Montoya's co-workers, especially his subordinate employee, Jennifer Jiron, who he worked with on a daily basis, perceived him as a leader, an effective communicator, professional in performing his duties, and as someone knowledgeable about his job.

18. During Montoya's employment with Defendant Mervyn's, Montoya's co-workers respected him with regard to his work performance.

19. Montoya's supervisor Dianne DeLaTorre agreed with Montoya's performance rating of "Excellent" in 1997. Plaintiff relied on this evaluation in hopes of being promoted and to someday retire from Mervyn's.

20. Defendant Mervyn's employee Dianne DeLaTorre, Montoya's supervisor, prepared and manufactured a "1998 Mid-Year Performance Review," purportedly covering the time period between February 1998 and July 1998, in which Defendant portrayed Montoya's

4

work performance as "satisfactory." Plaintiff was on an approved medical leave of absence from June 1998 to August 1998 for just cause discipline.

21. Defendant Mervyn's employee Dianne DeLaTorre's "satisfactory" rating of Montoya's work performance constituted a downgrade of at least two levels from Montoya's prior rating of "Excellent." Plaintiff relied on Defendant's custom, conduct, and practice that he would receive interim reviews and annual reviews for purposes of retention for employment, promotional opportunities, and for retirement purposes.

22. 1998 Mid-Year Performance Review by Montoya's supervisor Dianne DeLaTorre did not contain any explanation for the downgraded review of Montoya's work performance.

23. The 1998 Mid-Year Performance Review, was handwritten, was not dated and was not signed by Montoya or reviewed by Randy Allen who according to the form itself and Mervyn's policy pertaining to evaluations required signature, dates, and review by the employee and Mr. Allen, who was Ms. DeLaTorre's supervisor.

24. Montoya's previous performance reviews for the years 1996 and 1997 were typed, dated, and properly signed by Montoya and other supervisory personnel, in accordance with Mervyn's evaluation policy, custom, usage and procedures.

25. Montoya first saw the 1998 Mid-Year Performance Review prepared and manufactured by Dianne DeLaTorre in November 1999, when that document was produced at a mediation before the New Mexico Human Rights Commission.

26. Montoya examined his personnel file the week prior to his March 1, 1999, discharge, and the 1998 Mid-Year Performance Review prepared and manufactured by Dianne DeLaTorre was not in his personnel file at that time. When Plaintiff requested, in writing

5

and orally a copy of his personnel file, he was denied these requests by Mervyn's employees in Human Resources.

27. Defendant Mervyn's employee Dianne DeLaTorre included the 1998 Mid-Year Performance Review in Montoya's personnel file, without Montoya's knowledge, even though she claimed that the review was not final and was not issued. Ms. DeLaTorre's sworn testimony at the Human Rights Commission hearing is unworthy of belief.

28. Defendant Mervyn's employee Dianne DeLaTorre had the opportunity to contact Montoya regarding the 1998 Mid-Year Performance Review, but did not make any attempt to do so. Also, Plaintiff was in contact with store personnel, including Mr. Allen, Yvonne Gonzales (store manager), and Ms. DeLaTorre while on medical leave and the mid-term evaluation was never mentioned or presented to him.

29. Defendant never made any effort to inform Montoya that his job performance was deficient and failed to inform Montoya of any possible consequences, including any discipline, demotion, discharge or termination, for his conduct.

30. Defendant Mervyn's never informed Montoya that he lacked communication or leadership skills, which would lead him to believe that he would not qualify for an interview for the new Assets Protection Leader position. To the contrary, he relied, to his detriment, on the very good to excellent evaluations previously received and the outstanding awards given to him to at least warrant an interview for this new opportunity.

31. Defendant Mervyn's allowed other employees the opportunity to review, discuss and respond to mid-year evaluations, including 1998 mid-year evaluations.

32. Defendant's employee Randy Allen, Montoya's district supervisor, read and used the 1998

Mid Year Performance Review regarding Montoya in determining what persons to interview and hire for Asset Protection Team Leader positions. Allen also did not give credit to Plaintiff for his time off from work due to his medical leave as he did for another applicant as indicated in the "Profile Sheet."

33. Defendant's employee Randy Allen considered employee evaluations regarding the years 1997 and 1998 in determining what persons to interview and hire for Asset Protection Team Leader positions.

34. Defendant's employee Randy Allen read and used the 1998 Mid-Year Performance Review of Montoya, prepared by Dianne DeLaTorre, when he refused to interview Montoya for the position of Asset Protection Team Leader.

35. At the time Defendant's employee Randy Allen refused to interview Montoya for the position of Asset Protection Team Leader, Montoya's work performance, as documented in his personnel file, was "excellent" and there was no documentation or notice, written or otherwise, to Plaintiff showing that Montoya's work performance had slipped two whole notches on the performance rating scale utilized by Mervyn's.

36. At all times material to Plaintiff's Complaint, Defendant Mervyn's had in full force and effect "Mervyn's California Team Handbook" (Handbook), applicable to its employees, including Montoya. Although the Handbook contains an at will disclaimer, the Handbook also contains other promissory language, which when coupled with representations made to Plaintiff orally and in writing created an expectation of job security, continued employment and promotional opportunities for Plaintiff.

37. Defendant's Handbook provides for progressive discipline of its employees in a three (3)

step process consisting of "counseling, written and final warning. . . . If [an employee's] performance does not improve after receiving the proper warnings, [he] will be terminated." Defendant's Team Handbook, p. 20. Plaintiff relied, to his detriment, that these procedures would be followed, especially as to the alleged deficiencies noted by DeLaTorre in the fabricated 1998 mid-year evaluation which was used to deny him even the courtesy of an interview for the new position.

38. It was Defendant Mervyn's policy to review and discuss work performance evaluations with its employees, to advise employees of declining performance reviews, to have such evaluations and reviews properly dated and signed by the employee, and to have a high ranking senior or district employee, such as Allen, review and finalize employee performance reviews. Plaintiff relied, to his detriment, on these policies, custom and practice.

39. Defendant Mervyn's followed the progressive discipline policy outlined in its Handbook and followed its procedure for completing work performance reviews, including mid-year performance reviews, when dealing with other employees similarly situated to Montoya.

40. On or about February 8, 1999, Defendant's employee Diane Erlich issued to Montoya a letter in the form of an ultimatum that Montoya either could choose to be demoted to a Store Investigator position (the same position as his subordinate employee, Ms. Jennifer Jiron) with a $1.00 cut in pay or he could choose to be terminated from Defendant's company and receive severance pay, but only if he signed a release agreement.

41. Montoya intended to make his employment with Defendant Mervyn's his career and intended to remain with Defendant until the time he was eligible for retirement.

42. Defendant Mervyn's Handbook, representations, custom, practice and usage controlled the employer-employee relationship between Plaintiff and Mervyn's.

43. Defendant's Mervyn's Handbook, together with its policies, procedures, representations, the parties' past dealings, circumstances, and treatment of employees similarly situated to Montoya, gave Montoya a reasonable expectation that Defendant would follow its own Handbook, policies and procedures in disciplining, reviewing, terminating, discharging, or evaluating Montoya and in considering Montoya for employment advancement opportunities.

44. Defendant Mervyn's Handbook, together with its policies, procedures, representations, the parties' past dealings, circumstances, and treatment of employees similarly situated to Montoya, established the existence of an implied agreement whereby Defendant would terminate, discharge, discipline Montoya and consider Montoya for employment advancement opportunities in accordance with its Handbook, policies, procedures, and representations, conduct and practice.

45. Defendant's Mervyn's Handbook, together with its policies, procedures, representations, the parties' past dealings, circumstances, and treatment of employees similarly situated to Montoya, gave Montoya a reasonable expectation that Defendant would follow its own policies and procedures in terminating Montoya only for just cause.

46. Defendant Mervyn's Handbook, together with its policies, procedures, representations, the parties' past dealings, circumstances, and treatment of employees similarly situated to Montoya, established the existence of an implied agreement whereby Defendant would terminate or discharge Montoya only for just cause in accordance with its Handbook,

procedures and policies.

47. Before Defendant Mervyn's terminated Montoya's employment he earned the amount of $11.70/hour and had employment benefits including health insurance. His employment benefits with Defendant Mervyn's had a value of 30%.

48. After Defendant Mervyn's terminated Montoya's employment he was unemployed for a period of two weeks..

49. Montoya spent the amount of $1,000.00 to secure new employment after Defendant Mervyn's terminated his employment.

50. Montoya became employed again with the New Mexico Department of Transportation while retaining his other part-time work as he had done while working for Mervyn's in the position of Loss Control Specialist and earned a wage of $12.40 with benefits of 30%.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter of this action.

2. New Mexico law applies to the employment relationship between the parties in this case.

3. In New Mexico an implied agreement to terminate or discharge an employee only for cause exists when an employer or its representative or agent makes a promise or representation or its conduct is sufficiently specific to create a reasonable expectation in the mind of an employee that he could be discharged only for cause. Whether an implied agreement exists is determined by considering all the surrounding circumstances, including the parties' words and acts, what the parties sought to accomplish, the manner in which the parties dealt with each other, the employer's treatment of other employees in the same or similar circumstances, and any writings, handbooks or procedures used by the

employer. NMRA 2000, 13-2302. **See also** **Newberry v. Allied Stores, Inc.**, 108 N.M. 424, 426, 773 P.2d 1231, 1233 (1989) (citing **Kestenbaum v. Pennzoil Co.**, 108 N.M. 20, 766 P.2d 280 (1988)).

4. Where an implied agreement requiring good cause for termination is found, discharge of the employee cannot be justified on the basis of the employer's good faith, but rather must be supported by "reasonable grounds [for the employer] to believe that sufficient cause existed to justify [the employee's] termination." **Kestenbaum**, 108 N.M. at 27, 766 P.2d at 287. This is "an objective standard of reasonable belief". **Id.** at 28, 766 P.2d at 288.

5. In New Mexico an employer's conduct, representation, promise, employee dealings, circumstances, handbooks, writings, or procedures also may establish an implied agreement that its employees would not be discharged unless the employer followed a particular procedure. **Id.**

6. Where an implied agreement establishes a procedure whereby the employer must provide the employee with notice and specifics of the reason for termination, the employer can rely only on those reasons in justifying the termination and may not advance other justifiable reasons at trial. **Kestenbaum**, 108 N.M. at 26-27, 766 P.2d at 286-87.

7. In New Mexico a personnel manual results in an implied contract if it controls the employer-employee relationship and an employee can reasonably expect his or her employer to conform to the manual's procedures. **New Mexico Regulation & Licensing Dep't v. Lujan**, 127 N.M. 233, 238, 979 P.2d 744, 749, 1999-NMCA-059 (Ct. App. 1999).

8. In New Mexico, an implied agreement to follow only certain procedures in the termination

11

of an employee's employment is a variation of the more general implied agreement which overcomes the presumption of at-will employment. UJI 13-2302 (committee comment).

9. The determination of whether there is an implied agreement "is a question of fact to be discerned from the totality of the parties' statements and actions regarding the employment relationship." **Newberry**, 108 N.M. at 427, 773 P.2d at 1234.

10. An implied employment contract still can exist despite a disclaimer by the employer, where the employer's conduct reasonably leads employees to believe that they will not be terminated without just cause and a fair procedure. See **Kiedrowski v. Citizens Bank** 119 N.M. 572, 575-576, 893 P.2d 468 (Ct. App. 1995); **McGinnis v. Honeywell, Inc.**, 110 N.M. 1, 791 P.2d 452 (1990).

11. "A contractual disclaimer does not automatically negate a document's contractual status and must be read by reference to the parties 'norms of conduct and expectations founded upon them.'" **McGinnis**, 110 N.M. at 6, 791 P.2d at 457 (quoting **Zaccardi v. Zale Corp.**, 856 F.2d 1473, 1476-77 (10th Cir. 1988) (quoting **Hillis v. Meister**, 82 N.M. 474, 477, 483 P.2d 1314, 1317 (Ct. App. 1971))).

12. Defendant's Mervyn's had a duty to adhere to the terms of its Handbook its policies and its procedures before subjecting Montoya to discipline, demotion, termination, or discharge, and prior to refusing to permit him access to employment advancement opportunities, including an interview for the position of Asset Protection Team Leader.

13. Defendant Mervyn's had a duty to terminate or discharge Montoya from his employment only for just cause.

14. Defendant breached its duties to Montoya by wrongfully terminating his employment, by

failing to apply progressive discipline, by applying discipline to Montoya without his prior knowledge, by failing to properly review Montoya's work performance, and by denying him advancement opportunities in violation of the terms and conditions of Defendant's Handbook, policies and practices.

15. Defendant also breached its duty to Montoya by wrongfully terminating his employment without just cause.

16. In New Mexico an implied employment contract includes an implied covenant of good faith and fair dealing, whereby the parties have a duty to act in good faith and to deal fairly with each other with regard to the contract. **Bourgeous v. Horizon Healthcare Corp.**, 117 N.M. 434, 439, 872 P.2d 852, 857 (1994).

17. Defendant Mervyn's had a duty to deal fairly and in good faith with Montoya, in accordance with the implied employment contract, including a duty to adhere to the terms of its Handbook its policies and its procedures in subjecting Montoya to discipline, demotion, termination, or discharge, and prior to refusing to permit him access to employment advancement opportunities, including an interview for the position of Asset Protection Team Leader.

18. Defendant Mervyn's had a duty to deal fairly and in good faith with Montoya, in accordance with the implied employment contract, including a duty to adhere to the terms of its Handbook its policies and its procedures in terminating Montoya only for just cause.

19. Defendant Mervyn's breached its duty to deal fairly and in good faith with Montoya, by wrongfully terminating his employment, by failing to apply progressive discipline, by applying discipline to Montoya without his prior knowledge, by failing to properly review

f.  Emotional distress. NMRA 1986, 13-2310.

23. Punitive damages may be recovered for breach of contract when a defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights. **Romero v. Mervyn's**, 109 N.M. 249, 255, 784 P.2d 992, 998 (1989). "Each of the terms listed, standing alone, will support an award of punitive damages." **Id.**.

24. Defendant Mervyn's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for Montoya's rights.

25. Montoya is entitled to recover the damages from Defendant, including lost wages, lost benefits, reasonable expenses incurred in securing new employment, damages for emotional distress, consequential damages, punitive damages, pre-judgment and post-judgment interest to be proven at trial.

26. Reasonable attorney fees and costs for prosecution of this action before the Human Rights Commission, and upon removal and trial of this matter.

Respectfully submitted,

GILBERT J. VIGIL
Attorney for Plaintiff
1615 Central Ave. NW
Albuquerque, NM 87104
(505) 242-1796

I hereby certify that on ___August 2___, 2001,
a true and correct copy of the foregoing was faxed to:
Christopher Moody, Noeding & Moody, PC,
4300 San Mateo Blvd. NE, # B260, Albuquerque, NM 87110

Gilbert J. Vigil

15